IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| SAMUEL RANDLE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 6:15-CV-084-RP |
| | § | |
| THOMAS LOCKWOOD, et al., | § | |
| | § | |
| Defendants. | § | |

## ORDER

This cause of action comes before the Court on remand from the Fifth Circuit. On

November 10, 2016, in *Randle v. Lockwood*, No. 16-50393, slip op. (5th Cir. Nov. 10, 2016), the Fifth

Circuit reversed this Court's order denying two motions to dismiss individual defendants in this

case, and remanded to this Court for consideration of "each defendant's entitlement to qualified

immunity . . . on an individual basis." *Id.* at 7 n.7. In addition, Defendant Limestone County requests

that the Court consider its motion for reconsideration on the issue of municipal liability, which was

never ruled on prior to appeal. Based on its review of the Fifth Circuit's opinion, the numerous

existing filings and orders in this case, and the relevant law, the Court issues the following order.

### I. Background

According to allegations in his amended complaint, Plaintiff Samuel Randle was a detainee in

the Limestone County Jail when he was prescribed Trazodone for his chronic depression by a local

physician who regularly treated jail inmates, Dr. Jeffrey Rettig. (Am. Compl., Dkt. 9, ¶ 48).[1] While at

the jail on the morning of March 19, 2013, Plaintiff began to experience priapism, a painful erection

that lasts for more than four hours. (Am. Compl. ¶ 55). Priapism is a known side effect of

Trazodone. (Am. Compl. ¶ 55). Later that morning, and throughout the following week, he

---

[1] Plaintiff first began taking Trazodone, an anti-depressant, in 2012. (Am. Compl. ¶ 47).

repeatedly complained to officers in his cell block and a licensed vocational nurse on staff at the jail that he had a constant erection and was in severe pain. (Am. Compl. ¶¶ 56, 66–67, 74, 77, 81, 86, 90–91). His complaints went largely ignored—while the nurse was sometimes called to see him, she initially told him to "wait and see" how his symptoms progressed over time, and later, gave him only ibuprofen and an ice pack. (Am. Compl. ¶¶ 58–92).

The doctor did not see Plaintiff until making his regular rotations on Tuesday, March 26, after Plaintiff had been suffering with priapism for an entire week. (Am. Compl. ¶ 93). Upon examining him, Dr. Rettig ordered that Plaintiff be taken to the local hospital. (Am. Compl. ¶ 93). Two supervisors at the Limestone County Jail—Sergeant Jefferson and Sergeant Edwards—took Plaintiff, where the doctor who examined him quickly arranged his transfer to Providence Hospital in Waco so that he could immediately be seen by a urologist. (Am. Compl. ¶¶ 94–95). After Plaintiff was released from the local hospital, however, Jefferson and Edwards did not take him to Providence Hospital, but back to the jail. (Am. Compl. ¶ 97). There, County officials and policymakers reduced Plaintiff's bond to zero so that he could be released. (Am. Compl. ¶ 98–99).

Upon his release, Plaintiff's family immediately took him to Providence Hospital in Waco, where he had to undergo multiple surgeries on his penis. (Am. Compl. ¶ 101). Due to the lack of medical care, however, Plaintiff was left permanently impotent. (Am. Compl. ¶ 101).

Plaintiff filed this action on March 13, 2015, alleging constitutional violations under 42 U.S.C. § 1983, violations of the Americans with Disabilities Act ("ADA"), negligence, and medical malpractice. (Compl., Dkt. 1). Along with his complaint, he filed a motion for emergency discovery, requesting that he be allowed access to records from the jail to ensure that he could name all jail officials involved prior to the expiration of the statute of limitations. (Pl.'s Mot. for Discovery, Dkt. 3; Pl.'s Mot. for Reconsideration, Dkt.6). After the magistrate judge granted his motion, he filed an amended complaint, which named as defendants sixteen jailers and correctional supervisors, two

licensed vocational nurses employed at the jail, Dr. Jeffrey Rettig and Dr. Rettig's practice group, and Limestone County. (Am. Compl. ¶¶ 11–31).

Four different motions to dismiss were filed—one by Defendant Nikiah McCullen, a jail nurse ("Nurse Nicki"), one by the sixteen jailers, one by the county, and one by Dr. Rettig and his practice. (Dkts. 20–22, 33). Defendant Tammy McCullen ("Nurse McCullen") did not file a motion to dismiss. (*See* Tammy McCullen's Ans., Dkt. 19). These motions were referred to the magistrate judge, who recommended that each be denied.[2] (Dkts. 35–37). After Defendants filed responses to the magistrate's recommendations, and Plaintiff responded, this Court overruled the objections and adopted the reports and recommendations of the magistrate judge, denying the motions to dismiss. (Dkts. 50–52).

Defendant Limestone County and the individually named jail staff (the sixteen jailers and Nurse Nicki) filed motions for reconsideration soon afterward. (Dkts. 53–54). Neither of these motions was ruled on by the Court. The individual jail staff defendants then filed an interlocutory appeal, arguing that the Court's order erroneously ignored their arguments regarding qualified immunity. (Dkt. 57).[3] While the case was stayed pending appeal, Judge Walter Smith (the judge previously presiding over this action) resigned, and it was reassigned to the undersigned. (Dkt. 73).

On November 10, 2016, the Fifth Circuit reversed the earlier decision of this Court denying the individual defendants' motions to dismiss. *Randle*, No. 16-50393, slip op. at 8. It concluded that the district court failed to "determine the applicability of the jailers' asserted qualified immunity defense," and had focused only "on the jailers' argument that a heightened pleading standard applied to Randle's claims." *Id.* at 5. The Fifth Circuit explained that regardless of what pleading standard

---

[2] The magistrate judge did, however, recommend granting the county's motion to dismiss the ADA claim because Plaintiff failed to allege that he was denied the benefit of services "by reason of his disability." ((Report & Recomm. on Limestone Cty. Mot. to Dismiss at 5, Dkt. 35 at 5–7). No objections to this recommendation were raised. (Order, Dkt.. 52, at 5 n.2).

[3] The Court also certified the question of whether Plaintiff needed to serve an expert report to maintain his claims against Dr. Rettig and Rettig Family Health Care in federal court. (Dkt. 65). The Fifth Circuit denied leave to appeal the interlocutory order, however, after addressing the issue in another case. (Dkt. 71).

applied, "the district court was required to address whether the jailers were entitled to qualified immunity," and needed to do so "on an *individual basis.*" *Id.* at 6–7 & n.7. It then remanded the case back to this Court "to consider in the first instance whether each jailer is entitled to qualified immunity." *Id.* at 7.

Thus, two issues are currently before the Court. First, the Court will address the issue on remand—whether the sixteen jail staffers and Nurse Nicki ("the Individual Defendants") are entitled to qualified immunity. Second, the Court will briefly address Limestone County's motion for reconsideration, which was never addressed before the appeal and subsequent stay.[4]

## II. Standard of Review

When evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6), "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). Although Federal Rule of Civil Procedure 8 mandates only that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief," this standard demands more than unadorned accusations, "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570. The court must initially identify allegations in the complaint that are no more than legal conclusions or "[t]hreadbare recitals of a cause of action's elements," then assume the veracity of well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 79 (2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere

---

[4] The Individual Defendants' motion for reconsideration was also never addressed by the Court, but the same issues were raised by their appeal to the Fifth Circuit, and are addressed in this order.

4

possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

### III. Qualified Immunity

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Public officials are protected from suit by qualified immunity so long as their conduct does not violate a clearly established constitutional right. *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011). "To determine whether a public official is entitled to qualified immunity, [the court must] decide (1) whether the facts that the plaintiff has alleged make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013) (internal quotations omitted). "A right is clearly established when 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Jones v. Lowndes Cty.*, 678 F.3d 344, 351 (5th Cir. 2012)).

### A.    Constitutional Violation

Plaintiff brings claims for violations of the Fourteenth Amendment under 42 U.S.C. § 1983.[5] A pretrial detainee's constitutional rights are violated when prison officials treat his or her serious medical needs with deliberate indifference. *Thompson v. Upshur Cty.*, 245 F.3d 447, 457 (5th Cir. 2001). Under this standard, a plaintiff must first demonstrate "objective exposure to a substantial risk of serious harm." *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006). Even if this is demonstrated,

---

[5] "The constitutional rights of a pretrial detainee flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment, which provides that no state shall 'deprive any person of life, liberty, or property, without due process of law.'" *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525–26 (5th Cir. 1999) (quoting U.S. Const. amend. XIV, § 5). However, "the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement." *Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996).

however, "[a] prison official acts with deliberate indifference 'only if [(a)] he knows that inmates face a substantial risk of serious bodily harm and [(b)] he disregards that risk by failing to take reasonable measures to abate it.'" *Id.* at 346 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Deliberate indifference is a subjective standard; it requires that prison officials have actual knowledge of a serious risk of harm and then consciously disregard that risk. *Lawson v. Dallas Cty.*, 286 F.3d 257, 262 (5th Cir. 2002). "[T]he 'failure to alleviate a significant risk that [the official] should have perceived, but did not' is insufficient to show deliberate indifference.'" *Id.* at 756 (quoting *Farmer*, 511 U.S. at 838). Instead, the plaintiff must show "that prison officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Gobert*, 463 F.3d at 346 (quoting *Domino*, 239 F.3d at 756). "Unsuccessful medical treatment, acts of negligence, or medical malpractice" are not enough. *Id.* "Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).

### B.      Clearly Established Right

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting *Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Ashcroft v. al–Kidd*, 131 S.Ct. 2074, 2085 (2011)). While there is no requirement that caselaw directly on point exist, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

### IV. DISCUSSION

There can be no dispute that Plaintiff alleges he faced a serious risk of harm—he alleges not only that he suffered priapism and severe pain for days, but also that the risk he faced was fully

6

realized when he had to undergo multiple surgeries and was ultimately left impotent. Instead, the critical question here is whether Plaintiff has alleged that each of the Individual Defendants responded to that risk with deliberate indifference. *See Gobert*, 364 F.3d at 345. The Court will therefore consider whether Plaintiff has plausibly alleged that each of the seventeen Individual Defendants violated a constitutional right that was clearly established at the time the alleged violation occurred.

     1.  *Officer Lockwood*

Plaintiff alleges that Officer Lockwood "knew that [Plaintiff] had been suffering from a painful erection for more than four hours" because, "[a]ccording to the jail's duty rosters" he interacted with Plaintiff during that week. (Am. Compl. ¶ 64). Plaintiff further alleges that Officer Lockwood "actually knew that [Plaintiff] was not receiving medical care for his objectively serious medical condition, but did nothing to provide him access to medical care." (Am. Compl. ¶ 65). He also explains that Officer Lockwood "knew the only medical provider at the jail, [Nurse] McCullen, was treating [Plaintiff's] objectively serious condition like a juvenile joke,"—allegedly by laughing about Plaintiff's medical condition with other employees—but still did nothing to provide him access to meaningful care. (Am. Compl. ¶¶ 72–73).

Plaintiff also alleges that "[t]he symptoms and hazards of priapism are well known to even lay-people due to persistent advertising campaigns for erectile dysfunction drugs." (Am. Compl. ¶ 53). These ads regularly remind consumers to seek immediate medical attention for an erection lasting longer than four hours. (Am. Compl. ¶ 53). Plaintiff alleges that because of these ads, all of the individual defendants would have understood the seriousness of his medical condition.

Defendants argue that all of the allegations against Officer Lockwood (and several other officers, who the Court addresses below) are conclusory, speculative, and "global"—made by alleging the same conduct by a group of officers. They note that with respect to several officers,

Officer Lockwood included, there are no unique allegations. However, simply because several officers are all alleged to have committed the same egregious conduct does not mean they were not personally involved, or that they can avoid liability for that conduct. It would be a particularly unjust result if Plaintiff were unable to hold any officer liable because of the high number of officers that may have treated him with deliberate indifference over so many days. If, for example, Plaintiff had only suffered twenty-four hours without proper medical care instead of seven days, and had only made claims against the two or three officers working in his cell block during that time, it seems Defendants would not be able to argue his allegations were too global or conclusory. But, the allegations made against Officer Lockwood are based on his alleged individual actions and inactions—not because Plaintiff is trying to connect the officer to a group of other officers or the actions of another. Thus the Court rejects the argument that it should discount these allegations because they are "global," or really, applicable to so many officers.

Here, Plaintiff has plausibly alleged that Officer Lockwood was deliberately indifferent to his serious medical needs. First, the Court finds it plausible that Officer Lockwood subjectively knew that Plaintiff faced a serious risk of bodily harm because of his priapism. Plaintiff alleges that Officer Lockwood worked in his cell block while his medical condition and urgent need for medical care were known and apparent. Plaintiff alleges that he was "in extreme and obvious" pain, and repeatedly "complained" to officers or told them that "he needed medical attention." (Am. Compl. ¶¶ 68, 74). And while Defendants seek to trivialize Plaintiff's invocation of erectile dysfunction advertising in his complaint, the Court finds it appropriate, at this stage, to further demonstrate the likelihood that Officer Lockwood and other officers understood that Plaintiff's condition required immediate medical attention.

In addition, other courts addressing the issue have refused to dismiss complaints alleging prison employees knew of the serious nature of a priapism. *E.g.*, *Hasty v. Cty. of Montgomery*, No.

CIV.A. 12-4335, 2014 WL 830282, at *6 (E.D. Pa. Mar. 4, 2014) (denying motion to dismiss claims against medical staff where the plaintiff suffered three days with a priapism before he was ultimately examined and taken to the hospital, but left permanently impotent); *Campbell v. Broward Sheriff's Office*, No. 08-61916-CIV, 2011 WL 1134322, at *2 (S.D. Fla. Mar. 28, 2011) (denying motion to dismiss where plaintiff suffered with priapism for five days and was left permanently impotent); *cf. Wilson v. Groze*, 800 F. Supp. 2d 949, 957 (N.D. Ill. 2011) ("[T]he alleged denial of medical care for [plaintiff's] uncontrolled erection is far from trivial.").

Second, the Court concludes that it is plausible Officer Lockwood disregarded the serious medical risk Plaintiff faced by failing to take reasonable measures to address it. Plaintiff has plausibly alleged that Officer Lockwood knew that the only medical attention Plaintiff was receiving was from Nurse McCullen, and that Nurse McCullen was not taking his priapism seriously or providing him access to medical treatment.

In addition to finding that Plaintiff has adequately alleged a constitutional violation, the Court concludes that the violation—deliberate indifference to the serious medical needs of prisoners—was well established at the time of the alleged violations, *see Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment."); *Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996) (adopting "a deliberate indifference standard in measuring the corresponding set of due process rights of pretrial detainees"), and that a reasonable officer would have known that failing to provide access to medical care to a prisoner with an erection lasting longer than four hours would constitute a violation.

The Court acknowledges, however, the possibility that Officer Lockwood is nevertheless entitled to qualified immunity. Despite the plausibility of the allegations, whether Officer Lockwood was in fact deliberately indifferent to Plaintiff's medical condition depends on what exactly he knew

about Plaintiff's medical condition and the treatment (or lack of treatment) Plaintiff was receiving, when he knew it, and what, if anything, he did to try and secure Plaintiff medical treatment. These are difficult factual questions that require a more developed record to answer, particularly in light of the number of officers involved and the week-long timeline relevant to the claims at issue. In situations like this, where a court is "unable to rule on the immunity defense without further clarification of the facts," it "may defer its qualified immunity ruling and order limited discovery." *Hinojosa v. Livingston*, 807 F.3d 657, 670 (5th Cir. 2015). The Court therefore finds that further factual development is necessary to determine whether Officer Lockwood is entitled to qualified immunity.

   *2.  Officer Le*

   Plaintiff alleges that Officer Le was the first person he informed of his priapism on Tuesday, March 19, 2013. (Am. Compl. ¶ 55). At the time, he told Officer Le that "he had been suffering a 'constant erection' all morning, and that the condition had existed for several hours." (Am. Compl. ¶ 56). Officer Le contacted Nurse McCullen, who provided Plaintiff no medical treatment, but suggested he wait and see how his symptoms progressed. (Am. Compl. ¶¶ 57–58).

   Plaintiff further alleges that Officer Le, like several of the other officers, "knew that [Plaintiff] had been suffering from a painful erection for more than four hours" because, "[a]ccording to the jail's duty rosters" he interacted with Plaintiff during that week, (Am. Compl. ¶ 64), "actually knew that [Plaintiff] was not receiving medical care for his objectively serious medical condition," (Am. Compl. ¶ 65), and "knew [that] the only medical provider at the jail, [Nurse] McCullen, was treating [Plaintiff's] objectively serious condition like a juvenile joke." (Am. Compl. ¶¶ 72–73).

   Plaintiff also alleges that Officer Le worked over the weekend of March 23 and 24, and knew that Plaintiff was still "suffering" and in "intense pain" days after Plaintiff first reported his priapism to the officer, yet was told by Officer Le and six other officers working that weekend that "they

would not provide him access to medical care, and that he would need to wait to see Dr. Rettig on Tuesday." (Am. Compl. ¶¶ 90–91). Finally, Plaintiff alleges that Officer Le, like the other officers, would have known about the seriousness of his medical conditions because of "advertising campaigns for erectile dysfunction drugs." (Am. Compl. ¶ 53).

In addition to arguing that the allegations against Officer Le are too conclusory and global (an argument the Court has already rejected), Defendants argue that the only allegations unique to Officer Le—that he was informed of Plaintiff's condition and contacted Nurse McCullen—demonstrate the absence of deliberate indifference. Certainly, these allegations suggest that Officer Le initially tried, albeit unsuccessfully, to get Plaintiff medical treatment. And these initial allegations are inconsistent with the idea that Officer Le "disregarded the substantial health risk about which he knew." *Gobert*, 463 F.3d at 346. But Plaintiff's later allegations suggest Officer Le did just that—that at a later point, when Officer Le would have known Plaintiff had been suffering all week with an erection and that Plaintiff had not yet received proper treatment, he did nothing. Deliberate indifference can be demonstrated through such a refusal to treat. *See Zantiz v. Seal*, 602 F. App'x 154, 160 (5th Cir. 2015). Further, Officer Le's initial decision to contact a nurse when learning of Plaintiff's condition indicates that he had subjective knowledge of the seriousness of Plaintiff's medical needs, making the allegation that he later ignored Plaintiff's outcries all the more worrisome. The Court thus concludes that Plaintiff has plausibly alleged that Officer Le was deliberately indifferent to Plaintiff's serious medical needs. Such deliberate indifference was well established as a constitutional violation at the time it occurred. *See Estelle*, 429 U.S. at 104; *City of Corinth*, 74 F.3d at 650, and that a reasonable officer would have known that failing to provide access to medical care to a prisoner with priapism would constitute a violation.

Like with Officer Lockwood, however, the Court will defer its ruling on qualified immunity until further discovery is conducted regarding what Officer Le knew about Plaintiff's medical

11

condition and the treatment (or lack of treatment) he was receiving, when he knew it, and what exactly he may have done to secure Plaintiff proper treatment.

### 3. *Officer Vial*

Plaintiff alleges that Officer Vial, like several other officers, "knew that [Plaintiff] had been suffering from a painful erection for more than four hours" because, "[a]ccording to the jail's duty rosters" he interacted with Plaintiff during that week, (Am. Compl. ¶ 64), "actually knew that [Plaintiff] was not receiving medical care for his objectively serious medical condition," (Am. Compl. ¶ 65), and "knew [that] the only medical provider at the jail, [Nurse] McCullen, was treating [Plaintiff's] objectively serious condition like a juvenile joke." (Am. Compl. ¶¶ 72–73).

Plaintiff also alleges that Officer Vial was working in his cell block over the weekend of March 23 and 24, 2013, after Plaintiff had been suffering with a priapism for nearly a week. (Am. Compl. ¶¶ 90–91). Although "no medical staff present at the jail" that weekend, Officer Vial and each of the other officers working that weekend told Plaintiff that "they would not provide him access to medical care, and that he would need to wait to see Dr. Rettig on Tuesday," despite Plaintiff's continued complaints about his intense pain. (Am. Compl. ¶ 91). In addition, Plaintiff alleges that Officer Vial, like the other officers, would have known about the seriousness of his medical conditions because of "advertising campaigns for erectile dysfunction drugs." (Am. Compl. ¶ 53).

The Court concludes that Plaintiff has plausibly alleged that Officer Vial was both subjectively aware of the substantial risk of serious bodily harm faced by Plaintiff, and disregarded that risk by ignoring Plaintiff's suffering and need for immediate medical attention. In addition, the Court concludes that the right Officer Vial allegedly violated—the right to be free from a prison official's deliberate indifference to his serious medical needs—was well established at the time of the violation. *See Estelle*, 429 U.S. at 104; *City of Corinth*, 74 F.3d at 650, and that a reasonable officer

would have known that failing to provide access to medical care to a prisoner with priapism would constitute a violation.

Like with the other officers, however, the Court will defer ruling on qualified immunity and allow discovery to determine what Officer Vial knew about Plaintiff's condition, when he knew it, and what, if anything, he did to provide Plaintiff access to medical treatment.

   *4.   Officer Cotton*

Plaintiff alleges that Officer Cotton, like several other officers, "knew that [Plaintiff] had been suffering from a painful erection for more than four hours" because, "[a]ccording to the jail's duty rosters" he interacted with Plaintiff during that week, (Am. Compl. ¶ 64), "actually knew that [Plaintiff] was not receiving medical care for his objectively serious medical condition," (Am. Compl. ¶ 65), and "knew [that] the only medical provider at the jail, [Nurse] McCullen, was treating [Plaintiff's] objectively serious condition like a juvenile joke." (Am. Compl. ¶¶ 72–73). Yet Officer Cotton, like the other officers, did nothing to provide Plaintiff access to meaningful medical care. (Am. Compl. ¶ 73). In addition, Plaintiff alleges that Officer Cotton, like the other officers, would have known about the seriousness of his medical conditions because of "advertising campaigns for erectile dysfunction drugs." (Am. Compl. ¶ 53).

The Court concludes that Plaintiff has plausibly alleged that Officer Cotton both knew of the substantial risk of serious bodily harm faced by Plaintiff, and disregarded that risk by failing to do anything to provide him meaningful access to care. The Court also concludes that the right Officer Cotton allegedly violated—the right to be free from a prison official's deliberate indifference to his serious medical needs—was well established at the time of the violation. *See Estelle*, 429 U.S. at 104; *City of Corinth*, 74 F.3d at 650, and that a reasonable officer would have known that failing to provide access to medical care to a prisoner with priapism would constitute a violation.

The Court will again defer ruling on qualified immunity and allow discovery to determine what Officer Cotton knew about Plaintiff's condition, when he knew it, and what, if anything, he did to provide Plaintiff access to medical treatment.

     *5.   Officer Burleson*

Plaintiff alleges that Officer Burleson, like several other officers, "knew that [Plaintiff] had been suffering from a painful erection for more than four hours" because, "[a]ccording to the jail's duty rosters" he interacted with Plaintiff during that week, (Am. Compl. ¶ 64), "actually knew that [Plaintiff] was not receiving medical care for his objectively serious medical condition," (Am. Compl. ¶ 65), and "knew [that] the only medical provider at the jail, [Nurse] McCullen, was treating [Plaintiff's] objectively serious condition like a juvenile joke." (Am. Compl. ¶¶ 72–73). Plaintiff also alleges that Officer Burleson, like the other officers, did nothing to provide Plaintiff access to meaningful medical care. (Am. Compl. ¶ 73). In addition, Plaintiff alleges that Officer Burleson would have known about the seriousness of his medical conditions because of "advertising campaigns for erectile dysfunction drugs." (Am. Compl. ¶ 53).

The Court concludes that Plaintiff has plausibly alleged that Officer Burleson both knew of the substantial risk of serious bodily harm faced by Plaintiff, and disregarded that risk by failing to do anything to provide him meaningful access to care. The Court also concludes that the right Officer Burleson allegedly violated—the right to be free from a prison official's deliberate indifference to his serious medical needs—was well established at the time of the violation. *See Estelle*, 429 U.S. at 104; *City of Corinth*, 74 F.3d at 650, and that a reasonable officer would have known that failing to provide access to medical care to a prisoner with priapism would constitute a violation.

14

The Court will defer ruling on qualified immunity and allow discovery to determine what Officer Burleson knew about Plaintiff's condition, when he knew it, and what, if anything, he did to provide Plaintiff access to medical treatment.

    *6. Sergeant Graves*

Plaintiff alleges that Sergeant Graves, a correctional supervisor, "knew that [Plaintiff] had been suffering from a painful erection for more than four hours" because, "[a]ccording to the jail's duty rosters" he interacted with Plaintiff during that week, (Am. Compl. ¶ 64), "actually knew that [Plaintiff] was not receiving medical care for his objectively serious medical condition," (Am. Compl. ¶ 65), and "knew [that] the only medical provider at the jail, [Nurse] McCullen, was treating [Plaintiff's] objectively serious condition like a juvenile joke." (Am. Compl. ¶¶ 72–73). P

In addition, Plaintiff alleges that after Plaintiff had been suffering with a priapism for the third consecutive day, Plaintiff's cellmates reported to an officer that Plaintiff was "down" and Sergeant Graves was one of the officers who responded to the scene. (Am Compl. ¶¶ 77–78). Sergeant Graves and another officer then moved him to another cell, purportedly for medical observation. (Am. Compl. ¶ 79). However, just a few hours later, when Plaintiff had still not been seen by a physician or provided treatment and when his condition had still not changed, Sergeant Graves ordered that Plaintiff be returned to his cell and taken off medical observation. (Am. Compl. ¶ 85).

The Court concludes that Plaintiff has plausibly alleged that Sergeant Graves both knew of the substantial risk of serious bodily harm faced by Plaintiff, and disregarded that risk by failing to do anything to provide him meaningful access to care. Although Sergeant Graves moved Plaintiff to a cell for medical observation, he also moved him back to regular custody despite allegedly knowing Plaintiff had not been seen by a physician or received treatment. In addition, the Court concludes that the right Sergeant Graves allegedly violated—the right to be free from a prison official's

deliberate indifference to his serious medical needs—was well established at the time of the violation. *See Estelle*, 429 U.S. at 104; *City of Corinth*, 74 F.3d at 650, and that a reasonable officer would have known that failing to provide access to medical care to a prisoner with priapism would constitute a violation.

The Court will again defer ruling on qualified immunity and allow discovery to determine what Sergeant Graves knew about Plaintiff's condition, when he knew it, and what, if anything, he did to provide Plaintiff access to medical treatment.

  *7.  Officer Willett*

Plaintiff alleges that Officer Willett, like several other officers, "knew that [Plaintiff] had been suffering from a painful erection for more than four hours" because, "[a]ccording to the jail's duty rosters" he interacted with Plaintiff during that week, (Am. Compl. ¶ 64), "actually knew that [Plaintiff] was not receiving medical care for his objectively serious medical condition," (Am. Compl. ¶ 65), and "knew [that] the only medical provider at the jail, [Nurse] McCullen, was treating [Plaintiff's] objectively serious condition like a juvenile joke." (Am. Compl. ¶¶ 72–73). Yet Officer Willett, like the other officers, did nothing to provide Plaintiff access to meaningful medical care. (Am. Compl. ¶ 73). In addition, Plaintiff alleges that Officer Willett would have known about the seriousness of his medical conditions because of "advertising campaigns for erectile dysfunction drugs." (Am. Compl. ¶ 53).

The Court concludes that Plaintiff has plausibly alleged that Officer Willett both knew of the substantial risk of serious bodily harm faced by Plaintiff, and disregarded that risk by failing to do anything to provide him meaningful access to care. The Court also concludes that the right Officer Willett allegedly violated—the right to be free from a prison official's deliberate indifference to his serious medical needs—was well established at the time of the violation. *See Estelle*, 429 U.S. at 104;

*City of Corinth*, 74 F.3d at 650, and that a reasonable officer would have known that failing to provide access to medical care to a prisoner with priapism would constitute a violation.

The Court will defer ruling on qualified immunity and allow discovery to determine what Officer Willett knew about Plaintiff's condition, when he knew it, and what, if anything, he did to provide Plaintiff access to medical treatment.

   8.   *Officer Nehring*

Plaintiff alleges that Officer Nehring, like several other officers, "knew that [Plaintiff] had been suffering from a painful erection for more than four hours" because, "[a]ccording to the jail's duty rosters" he interacted with Plaintiff during that week, (Am. Compl. ¶ 64), "actually knew that [Plaintiff] was not receiving medical care for his objectively serious medical condition," (Am. Compl. ¶ 65), and "knew [that] the only medical provider at the jail, [Nurse] McCullen, was treating [Plaintiff's] objectively serious condition like a juvenile joke." (Am. Compl. ¶¶ 72–73).

Plaintiff also alleges that Officer Nehring was working in his cell block over the weekend of March 23 and 24, 2013, after Plaintiff had been suffering with priapism for nearly a week. (Am. Compl. ¶¶ 90–91). Although "no medical staff were present at the jail" that weekend, Officer Nehring and each of the other officers working that weekend told Plaintiff that "they would not provide him access to medical care, and that he would need to wait to see Dr. Rettig on Tuesday," despite Plaintiff's continued complaints about his intense pain. (Am. Compl. ¶ 91). In addition, Plaintiff alleges that Officer Nehring would have known about the seriousness of his medical conditions because of "advertising campaigns for erectile dysfunction drugs." (Am. Compl. ¶ 53).

The Court concludes that Plaintiff has plausibly alleged that Officer Nehring was both subjectively aware of the substantial risk of serious bodily harm faced by Plaintiff and disregarded that risk by ignoring Plaintiff's suffering and need for immediate medical attention. The Court also concludes that the right Officer Nehring allegedly violated—the right to be free from a prison

official's deliberate indifference to his serious medical needs—was well established at the time of the violation. *See Estelle*, 429 U.S. at 104; *City of Corinth*, 74 F.3d at 650, and that a reasonable officer would have known that failing to provide access to medical care to a prisoner with priapism would constitute a violation.

The Court will defer ruling on qualified immunity and allow discovery to determine what Officer Nehring knew about Plaintiff's condition, when he knew it, and what, if anything, he did to provide Plaintiff access to medical treatment.

*9. Officer Wiley*

Plaintiff alleges that Officer Wiley, like several other officers, "knew that [Plaintiff] had been suffering from a painful erection for more than four hours" because, "[a]ccording to the jail's duty rosters" he interacted with Plaintiff during that week, (Am. Compl. ¶ 64), "actually knew that [Plaintiff] was not receiving medical care for his objectively serious medical condition," (Am. Compl. ¶ 65), and "knew [that] the only medical provider at the jail, [Nurse] McCullen, was treating [Plaintiff's] objectively serious condition like a juvenile joke." (Am. Compl. ¶¶ 72–73).

Plaintiff also alleges that Officer Wiley was working in his cell block over the weekend of March 23 and 24, 2013, after Plaintiff had been suffering withpriapism for nearly a week. (Am. Compl. ¶¶ 90–91). Although "no medical staff were present at the jail" that weekend, Officer Wiley and each of the other officers working that weekend told Plaintiff that "they would not provide him access to medical care, and that he would need to wait to see Dr. Rettig on Tuesday," despite Plaintiff's continued complaints about his intense pain. (Am. Compl. ¶ 91). In addition, Plaintiff alleges that Officer Wiley, like the other officers, would have known about the seriousness of his medical conditions because of "advertising campaigns for erectile dysfunction drugs." (Am. Compl. ¶ 53).

The Court concludes that Plaintiff has plausibly alleged that Officer Wiley was both subjectively aware of the substantial risk of serious bodily harm faced by Plaintiff and disregarded that risk by ignoring Plaintiff's suffering and need for immediate medical attention. The Court also concludes that the right Officer Wiley allegedly violated—the right to be free from a prison official's deliberate indifference to his serious medical needs—was well established at the time of the violation. *See Estelle*, 429 U.S. at 104; *City of Corinth*, 74 F.3d at 650, and that a reasonable officer would have known that failing to provide access to medical care to a prisoner with priapism would constitute a violation.

Like with the other officers, the Court will defer ruling on qualified immunity and allow discovery to determine what Officer Wiley knew about Plaintiff's condition, when he knew it, and what, if anything, he did to provide Plaintiff access to medical treatment.

*10. Officer Labella*

Plaintiff alleges that Officer Labella, like several other officers, "knew that [Plaintiff] had been suffering from a painful erection for more than four hours" because, "[a]ccording to the jail's duty rosters" he interacted with Plaintiff during that week, (Am. Compl. ¶ 64), "actually knew that [Plaintiff] was not receiving medical care for his objectively serious medical condition," (Am. Compl. ¶ 65), and "knew [that] the only medical provider at the jail, [Nurse] McCullen, was treating [Plaintiff's] objectively serious condition like a juvenile joke." (Am. Compl. ¶¶ 72–73). Yet Officer Labella, like the other officers, did nothing to provide Plaintiff access to medical care. (Am. Compl. ¶ 73). In addition, Plaintiff alleges that Officer Labella would have known about the seriousness of his medical conditions because of "advertising campaigns for erectile dysfunction drugs." (Am. Compl. ¶ 53).

The Court concludes that Plaintiff has plausibly alleged that Officer Labella both knew of the substantial risk of serious bodily harm faced by Plaintiff, and disregarded that risk by failing to

do anything to provide him meaningful access to care. The Court also concludes that the right Officer Labella allegedly violated—the right to be free from a prison official's deliberate indifference to his serious medical needs—was well established at the time of the violation. *See Estelle*, 429 U.S. at 104; *City of Corinth*, 74 F.3d at 650, and that a reasonable officer would have known that failing to provide access to medical care to a prisoner with priapism would constitute a violation.

The Court will again defer ruling on qualified immunity and allow discovery to determine what Officer Labella knew about Plaintiff's condition, when he knew it, and what, if anything, he did to provide Plaintiff access to medical treatment.

### 11. *Officer Allen*

Plaintiff alleges that Officer Allen, like other officers, "knew that [Plaintiff] had been suffering from a painful erection for more than four hours" because, "[a]ccording to the jail's duty rosters" he interacted with Plaintiff during that week, (Am. Compl. ¶ 64), "actually knew that [Plaintiff] was not receiving medical care for his objectively serious medical condition," (Am. Compl. ¶ 65), and "knew [that] the only medical provider at the jail, [Nurse] McCullen, was treating [Plaintiff's] objectively serious condition like a juvenile joke." (Am. Compl. ¶¶ 72–73).

In addition, Plaintiff alleges that after he had been suffering with priapism for three consecutive days, Plaintiff's cellmates reported to Officer Allen that Plaintiff was "down." (Am Compl. ¶¶ 77–78). Officer Allen presumably reported this to Sergeant Graves and Nurse McCullen, because they soon helped him in responding to the scene. (*See* Am. Compl. ¶ 78). Officer Allen and Sergeant Graves then moved Plaintiff to another cell, purportedly for medical observation. (Am. Compl. ¶ 79). Although Plaintiff was later moved back to his cell although his condition had not improved and he had not received appropriate medical treatment, Plaintiff does not allege that Officer Allen was in any way involved in (or even aware of) that decision. (*See* Am. Compl. ¶ 85).

20

Defendants argue here that the only allegations unique to Officer Allen are inconsistent with deliberate indifference—when Officer Allen was alerted of Plaintiff's urgent need for medical care, he obtained help from a correctional supervisor and medical staff. Further, unlike the allegations against Officer Le, there is no suggestion that Officer Allen later knew that Plaintiff had not received appropriate care and done nothing. Thus, while it is possible that Officer Allen was nevertheless deliberately indifferent—for example, if Officer Allen later refused to get Plaintiff medical treatment when he knew he had not yet received appropriate care—it is not plausibly alleged in the complaint. *See Iqbal*, 556 U.S. 662, 678 (2009) ("The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."). The Court will therefore grant Defendant's motion to dismiss with respect to Officer Allen.

   *12. Officer Winn*

   Plaintiff alleges that Officer Winn, like several other officers, "knew that [Plaintiff] had been suffering from a painful erection for more than four hours" because, "[a]ccording to the jail's duty rosters" he interacted with Plaintiff during that week, (Am. Compl. ¶ 64), "actually knew that [Plaintiff] was not receiving medical care for his objectively serious medical condition," (Am. Compl. ¶ 65), and "knew [that] the only medical provider at the jail, [Nurse] McCullen, was treating [Plaintiff's] objectively serious condition like a juvenile joke." (Am. Compl. ¶¶ 72–73). Yet Officer Winn, like the other officers, did nothing to provide Plaintiff access to medical care. (Am. Compl. ¶ 73). In addition, Plaintiff alleges that Officer Winn, like the other officers, would have known about the seriousness of his medical conditions because of "advertising campaigns for erectile dysfunction drugs." (Am. Compl. ¶ 53).

   The Court concludes that Plaintiff has plausibly alleged that Officer Winn both knew of the substantial risk of serious bodily harm faced by Plaintiff, and disregarded that risk by failing to do anything to provide him meaningful access to care. The Court also concludes that the right Officer

Winn allegedly violated—the right to be free from a prison official's deliberate indifference to his serious medical needs—was well established at the time of the violation. *See Estelle*, 429 U.S. at 104; *City of Corinth*, 74 F.3d at 650, and that a reasonable officer would have known that failing to provide access to medical care to a prisoner with priapism would constitute a violation.

The Court will again defer ruling on qualified immunity and allow discovery to determine what Officer Winn knew about Plaintiff's condition, when he knew it, and what, if anything, he did to provide Plaintiff access to medical treatment.

### 13. *Lieutenant Rhodes*

Plaintiff alleges that Lieutenant Rhodes, like several other officers, "knew that [Plaintiff] had been suffering from a painful erection for more than four hours" because, "[a]ccording to the jail's duty rosters" he interacted with Plaintiff during that week, (Am. Compl. ¶ 64), "actually knew that [Plaintiff] was not receiving medical care for his objectively serious medical condition," (Am. Compl. ¶ 65), and "knew [that] the only medical provider at the jail, [Nurse] McCullen, was treating [Plaintiff's] objectively serious condition like a juvenile joke." (Am. Compl. ¶¶ 72–73).

Plaintiff also alleges that when Nurse McCullen was distributing medication on March 22, 2013, he begged her for help, and she told him that she had talked to "correctional staff at the jail, including, upon information and belief, supervisors like Rhodes, Jefferson, and Edwards. . . . [and that] the supervisors offered [Plaintiff] the opportunity to go to the 'safe cell,' a solitary confinement cell, to masturbate." (Am. Compl. ¶ 86). Plaintiff responded that masturbating would be extremely painful. (Am. Compl. ¶ 86).

Plaintiff further alleges that Lieutenant Rhodes was working in his cell block over the weekend of March 23 and 24, 2013, after Plaintiff had been suffering with priapism for nearly a week. (Am. Compl. ¶¶ 90–91). Although "no medical staff were present at the jail" that weekend, Lieutenant Rhodes and each of the other officers working that weekend told Plaintiff that "they

22

would not provide him access to medical care, and that he would need to wait to see Dr. Rettig on Tuesday," despite Plaintiff's continued complaints about his intense pain. (Am. Compl. ¶ 91). In addition, Plaintiff alleges that Lieutenant Rhodes, like the other officers, would have known about the seriousness of his medical conditions because of "advertising campaigns for erectile dysfunction drugs." (Am. Compl. ¶ 53).

Defendants argue, in particular, that the allegation most unique to Lieutenant Rhodes—that a supervisor like Lieutenant Rhodes told Nurse McCullen to offer Plaintiff a safe cell in which to masturbate—is speculative and insufficient to state a violation. With respect to this allegation, the Court agrees. While Plaintiff's other allegations listing officers are based on the fact that each of them worked on his cell block while he was experiencing a priapism, and by the nature of that work, would have each known of his condition and failed to respond appropriately, here, to conclude that any particular officer, including Lieutenant Rhodes, offered a certain remedy because Nurse McCullen said correctional staff offered such a remedy is too tenuous to be plausible.

However, even discounting the above allegation, the Court concludes that Plaintiff has otherwise plausibly alleged that Lieutenant Rhodes was both subjectively aware of the substantial risk of serious bodily harm faced by Plaintiff, and disregarded that risk by ignoring Plaintiff's suffering and need for immediate medical attention. The Court also concludes that the right Lieutenant Rhodes allegedly violated—the right to be free from a prison official's deliberate indifference to his serious medical needs—was well established at the time of the violation. *See Estelle*, 429 U.S. at 104; *City of Corinth*, 74 F.3d at 650, and that a reasonable officer would have known that failing to provide access to medical care to a prisoner with priapism would constitute a violation.

Like with the other officers, the Court will defer ruling on qualified immunity and allow discovery to determine what Lieutenant Rhodes knew about Plaintiff's condition, when he knew it, and what, if anything, he did to provide Plaintiff access to medical treatment.

    *14. Officer Gude*

Plaintiff alleges that Officer Gude, like several other officers, "knew that [Plaintiff] had been suffering from a painful erection for more than four hours" because, "[a]ccording to the jail's duty rosters" he interacted with Plaintiff during that week, (Am. Compl. ¶ 64), "actually knew that [Plaintiff] was not receiving medical care for his objectively serious medical condition," (Am. Compl. ¶ 65), and "knew [that] the only medical provider at the jail, [Nurse] McCullen, was treating [Plaintiff's] objectively serious condition like a juvenile joke." (Am. Compl. ¶¶ 72–73). Yet Officer Gudd did nothing to provide Plaintiff access to medical care. (Am. Compl. ¶ 73). In addition, Plaintiff alleges that Officer Gudd would have known about the seriousness of his medical conditions because of "advertising campaigns for erectile dysfunction drugs." (Am. Compl. ¶ 53).

The Court concludes that Plaintiff has plausibly alleged that Officer Gude both knew of the substantial risk of serious bodily harm faced by Plaintiff, and disregarded that risk by failing to do anything to provide him meaningful access to care. The Court also concludes that the right Officer Gude allegedly violated—the right to be free from a prison official's deliberate indifference to his serious medical needs—was well established at the time of the violation. *See Estelle*, 429 U.S. at 104; *City of Corinth*, 74 F.3d at 650.

The Court will again defer ruling on qualified immunity and allow discovery to determine what Officer Gude knew about Plaintiff's condition, when he knew it, and what, if anything, he did to provide Plaintiff access to medical treatment.

*15. Sergeant Jefferson*

Plaintiff alleges that Sergeant Jefferson, like several other officers, "knew that [Plaintiff] had been suffering from a painful erection for more than four hours" because, "[a]ccording to the jail's duty rosters" he interacted with Plaintiff during that week, (Am. Compl. ¶ 64), "actually knew that [Plaintiff] was not receiving medical care for his objectively serious medical condition," (Am. Compl. ¶ 65), and "knew [that] the only medical provider at the jail, [Nurse] McCullen, was treating [Plaintiff's] objectively serious condition like a juvenile joke." (Am. Compl. ¶¶ 72–73).

Plaintiff also alleges that when Nurse McCullen was distributing medication on March 22, 2013, he begged her for help, and she told him that she had talked to "correctional staff at the jail, including, upon information and belief, supervisors like Rhodes, Jefferson, and Edwards. . . . [and that] the supervisors offered [Plaintiff] the opportunity to go to the 'safe cell,' a solitary confinement cell, to masturbate." (Am. Compl. ¶ 86). Plaintiff responded that masturbating would be extremely painful. (Am. Compl. ¶ 86).

Plaintiff further alleges that Sergeant Jefferson was working in his cell block over the weekend of March 23 and 24, 2013, after Plaintiff had been suffering with a priapism for nearly a week. (Am. Compl. ¶¶ 90–91). Although "no medical staff were present at the jail" that weekend, Sergeant Jefferson and each of the other officers working that weekend told Plaintiff that "they would not provide him access to medical care, and that he would need to wait to see Dr. Rettig on Tuesday," despite Plaintiff's continued complaints about his intense pain. (Am. Compl. ¶ 91). In addition, Plaintiff alleges that Sergeant Jefferson, like the other officers, would have known about the seriousness of his medical conditions because of "advertising campaigns for erectile dysfunction drugs." (Am. Compl. ¶ 53).

Finally, Plaintiff alleges that after Dr. Rettig instructed them to, Sergeant Jefferson and Sergeant Edwards took Plaintiff to Limestone Medical Center. (Am. Compl. ¶ 94). After examining

him, the doctor at Limestone Medical Center realized that Plaintiff "needed to see a urologist immediately, and arranged for his care to be transferred to Providence Hospital in Waco." (Am. Compl. ¶ 95). The doctor then told Sergeant Jefferson and Sergeant Edwards "that [Plaintiff] needed to be taken to Providence Hospital immediately, and that he was only being released from the hospital to ensure he could receive the treatment he needed at Providence Hospital." (Am. Compl. ¶ 96). Plaintiff alleges, however, that Sergeant Jefferson and Sergeant Edwards did not take him to the hospital in Waco, but instead, took him back to the jail, directly denying Plaintiff access to prescribed medical care. (Am. Compl. ¶ 97). Plaintiff was released from the jail later that day, but was never provided appropriate medical treatment prior to his release. (*See* Am. Compl. ¶ 99).

Here, in addition to various other arguments, Defendants argue that Sergeant Edwards was a mere transport officer, and that she "[r]eturn[ed] the few short miles to the Jail for direction does not state 'deliberate indifference' or objective indifference." (Defs.' Obj., Dkt, 42, at 9). As an initial matter, this argument is inconsistent with the alleged facts. According to the complaint, Sergeant Edwards had very explicit directions—and those were to take Plaintiff to Providence Hospital in Waco immediately. That these directions were from a physician, rather than some other correctional supervisor, carries no special weight considering that Sergeant Jefferson took Plaintiff to Limestone Hospital in the first place at the direction of another physician, Dr. Rettig.

Further, regardless of how far they were away from the jail, these allegations indicate that Sergeant Jefferson—who knew how serious Plaintiff's condition was because she was expressly informed about its severity by a physician—completely disregarded those directions. Such disregard for Plaintiff's medical needs amounts to deliberate indifference. *See Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) ("A prison inmate can demonstrate an Eighth Amendment violation by showing that a prison official . . . intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."). Based on the allegations

that Sergeant Jefferson returned Plaintiff to the jail against the express instructions of a physician and the other allegations that she previously knew about Plaintiff's medical condition and failed to provide him access to appropriate care, the Court finds that Plaintiff has plausibly alleged deliberate indifference to Plaintiff's serious medical needs. The Court also concludes that the right Sergeant Jefferson allegedly violated—the right to be free from a prison official's deliberate indifference to his serious medical needs—was well established at the time of the violation. *See Estelle*, 429 U.S. at 104; *City of Corinth*, 74 F.3d at 650, and that a reasonable officer would have known that failing to provide access to medical care to a prisoner with priapism would constitute a violation.

The Court does not see the need, however, to delay its ruling on qualified immunity for Sergeant Jefferson. Unlike the other officers, where plausible allegations exist that they were deliberately indifferent, but questions remain regarding when the officers knew about Plaintiff's medical condition and the care he was receiving, the allegations regarding Sergeant Jefferson's decision to deny Plaintiff prescribed medical care are quite specific. Obviously, these allegations still must be proven, but the same need for clarity regarding the facts does not exist. The Court therefore denies Sergeant Jefferson's motion to dismiss on the basis of qualified immunity.[6]

*16. Sergeant Edwards*

Plaintiff alleges that Sergeant Edwards, like several other officers, "knew that [Plaintiff] had been suffering from a painful erection for more than four hours" because, "[a]ccording to the jail's duty rosters" he interacted with Plaintiff during that week, (Am. Compl. ¶ 64), "actually knew that [Plaintiff] was not receiving medical care for his objectively serious medical condition," (Am. Compl.

---

[6] The Court notes that this does not mean that Sergeant Jefferson may not nevertheless demonstrate that he is entitled to qualified immunity at summary judgment. *See* Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815, 86 L. Ed. 2d 411 (1985) ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery. . . . Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts.").

¶ 65), and "knew [that] the only medical provider at the jail, [Nurse] McCullen, was treating [Plaintiff's] objectively serious condition like a juvenile joke." (Am. Compl. ¶¶ 72–73).

Plaintiff also alleges that when Nurse McCullen was distributing medication on March 22, 2013, he begged her for help, and she told him that she had talked to "correctional staff at the jail, including, upon information and belief, supervisors like Rhodes, Jefferson, and Edwards. . . . [and that] the supervisors offered [Plaintiff] the opportunity to go to the 'safe cell,' a solitary confinement cell, to masturbate." (Am. Compl. ¶ 86). Plaintiff responded that masturbating would be extremely painful. (Am. Compl. ¶ 86).

Plaintiff further alleges that Sergeant Edwards was working in his cell block over the weekend of March 23 and 24, 2013, after Plaintiff had been suffering with a priapism for nearly a week. (Am. Compl. ¶¶ 90–91). Although "no medical staff present at the jail" that weekend, Sergeant Jefferson and each of the other officers working that weekend told Plaintiff that "they would not provide him access to medical care, and that he would need to wait to see Dr. Rettig on Tuesday," despite Plaintiff's continued complaints about his intense pain. (Am. Compl. ¶ 91). In addition, Plaintiff alleges that Sergeant Edwards, like the other officers, would have known about the seriousness of his medical conditions because of "advertising campaigns for erectile dysfunction drugs." (Am. Compl. ¶ 53).

Finally, Plaintiff alleges that after Dr. Rettig instructed them to, Sergeant Jefferson and Sergeant Edwards took Plaintiff to Limestone Medical Center. (Am. Compl. ¶ 94). After examining him, the doctor at Limestone Medical Center realized that Plaintiff "needed to see a urologist immediately, and arranged for his care to be transferred to Providence Hospital in Waco." (Am. Compl. ¶ 95). The doctor told Sergeant Jefferson and Sergeant Edwards "that [Plaintiff] needed to be taken to Providence Hospital immediately, and that he was only being released from the hospital to ensure he could receive the treatment he needed at Providence Hospital." (Am. Compl. ¶ 96).

28

Plaintiff alleges, however, that Sergeant Jefferson and Sergeant Edwards did not take Plaintiff to the hospital in Waco, but instead, took him back to the jail, directly denying Plaintiff access to prescribed medical care. (Am. Compl. ¶ 97). Plaintiff was released from the jail later that day to obtain appropriate medical care himself. (Am. Compl. ¶ 99).

Like with Sergeant Jefferson, the Court concludes that Plaintiff's complaint plausibly alleges Sergeant Edwards' deliberate indifference, and that there is no reason to delay a ruling on qualified immunity. The Court therefore denies Sergeant Edwards' motion to dismiss on the basis of qualified immunity.

    *17. Nurse Nicki*

Compared to many of the other defendants, Plaintiff's complaint contains few allegations regarding how Nurse Nicki's actions were related to his claims. Primarily, he alleges that when Plaintiff's mother contacted the jail and spoke to a nurse, she "likely" spoke to Nurse McCullen, but in the alternative, spoke to Nurse Nicki. (Am. Compl. ¶ 88). His mother informed this nurse that her son's condition was a medical emergency and that he needed to see a doctor immediately, but alleges that the nurse refused to contact a physician. (Am. Compl. ¶¶ 88–89).

Defendants suggest that Plaintiff's assertions that Nurse Nicki was involved, which are plead in the alternative, constitute conclusory grouping. But alternative pleadings, even where inconsistent, are allowed by the Federal Rules of Civil Procedure. Fed. R. Civ. P. 8(d)(e) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). In addition, defendants may be joined in the alternative. Fed. R. Civ. P. 20(a)(2)(A) ("Persons . . . may be joined in one action as defendants if any right to relief is asserted against them jointly, severally, *or in the alternative* . . . ." (emphasis added)). Further, the Court finds it plausible that if Plaintiff's mother called and spoke to a nurse, it may have been Nurse Nicki, one of two licensed vocational nurses who worked at the jail. (Am. Compl. ¶¶ 5, 38).

The Court therefore rejects Defendants' arguments and concludes that Plaintiff has plausibly alleged that Nurse Nicki was deliberate indifferent to his severe medical needs. That Plaintiff's mother is alleged to have expressly told Nurse Nicki that her son was experiencing a medical emergency would give Nurse Nicki subjective knowledge of that emergency. That Nurse Nicki then failed to do anything to provide Plaintiff access to medical care would be sufficient to establish deliberate indifference. In addition, the right Nurse Nicki allegedly violated—the right to be free from a prison official's deliberate indifference to his serious medical needs—was well established at the time of the violation. *See Estelle*, 429 U.S. at 104; *City of Corinth*, 74 F.3d at 650, that a reasonable person would have known that failing to provide access to medical care to a prisoner with priapism would constitute a violation.

With respect to Nurse Nicki, the Court will, however, delay its ruling on qualified immunity to determine whether it was in fact Nurse Nicki who spoke to Plaintiff's mother and, if so, whether she took any action to provide Plaintiff with access to medical care.

## V. Motion for Reconsideration

In addition to the qualified immunity issue on remand, Defendant Limestone County reurges its motion for reconsideration of its motion to dismiss. (Dkt. 53). Primarily, Limestone County argues that pleading a single incident involving the Plaintiff himself is insufficient to support municipal liability and that Dr. Rettig, who was contracted by Limestone County, cannot be a policymaker.

The Federal Rules of Civil Procedure do not recognize a "motion for reconsideration" by that name. *Lavespere v. Niagara Mack & Tool Works, Inc.*, 910 F.2d 167, 173 (5th Cir. 1991). However, the Fifth Circuit has held that a motion for reconsideration should be treated as a motion to alter or amend judgment under Rule 59(e) if it is filed within twenty-eight days of the judgment at issue;

otherwise, it is considered a motion for relief under Rule 60(b). *Shepherd v. Int'l Paper Co.*, 372 F.3d 326, 328 n.1 (5th Cir. 2004).[7]

Here, the Court's initial order denying Defendant Limestone County's motion to dismiss was entered March 31, 2016; the motion for reconsideration was filed April 5, 2016. The Court therefore reviews the motion under Federal Rule of Civil Procedure 59(e).

### A. Standard of Review

"A Rule 59(e) motion 'calls into question the correctness of a judgment.'" *Templet v. HydroChem Inc.*, 367 F.3d 473, 478 (5th Cir. 2004) (quoting *In re Transtexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002)). The Fifth Circuit has repeatedly explained that "'[m]otions to alter or amend judgments cannot be used raise arguments which could, and should, have been made before judgment issued' and 'cannot be used to argue a case under a new legal theory.'" *Benefit Recovery, Inc. v. Donelon*, 521 F.3d 326, 329 (5th Cir. 2008) (quoting *Elementis Chromium L.P. v. Coastal States Petroleum Co.*, 450 F.3d 607, 610 (5th Cir.2006)). Instead, a Rule 59(e) motion "serve[s] the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *Templet*, 367 F.3d at 479. Granting such a motion is an "extraordinary remedy that should be used sparingly." *Id.*

In its motion for reconsideration, Limestone County makes arguments appropriate for a Rule 59(e) motion—it argues that the Court misapplied the standard for municipal liability to Plaintiff's complaint. Based on its review of the motion, the record in this case, and the relevant case law, however, the Court concludes that its prior order denying Limestone County's motion to dismiss contained no manifest errors of law, and it will therefore deny the motion for reconsideration.

---

[7] In *Shepherd*, the Fifth Circuit held that a motion for reconsideration should be considered a Rule 59(e) motion if filed within ten days of the order in question. *Shepherd*, 372 F.3d at 328 n.1. The 2009 amendments to the Federal Rules changed Rule 59(e)'s deadline to 28 days. Fed. R. Civ. P. 59(e).

### B. Municipal Liability

Municipalities and other local governments may be held liable for constitutional violations under § 1983 where official policy or custom caused those violations. *Bennett v. City of Slidell*, 728 F.2d 762, 766 (5th Cir. 1984). Municipalities may not, however, be held liable for such violations under theories of respondeat superior or vicarious liability. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–92 (1978). In order to ensure that a municipality is not subject to liability merely because it employs a tortfeasor, municipal liability under § 1983 requires proof of three elements. *Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir. 2001). First, there must be an official policymaker "with actual or constructive knowledge of the constitutional violation." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 167 (5th Cir. 2010). Second, there must be an "official policy." *Id.* at 166. Such policy may either be a policy statement, ordinance, or regulation, or it may be a custom that is "a persistent, widespread practice of City officials of employees." *Piotrowski*, 237 F.3d at 579 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984)). Third, there must be "a violation of constitutional rights whose moving force is the policy or custom." *Id.* at 578; *Zarnow*, 614 F.3d at 166. In short, "[m]unicipal liability requires deliberate action attributable to the municipality that is the direct cause of the alleged constitutional violation." *Zarnow*, 614 F.3d at 167.

### C. Discussion

Limestone County advances two arguments in support of its motion for reconsideration. First, it argues that the Court's order fails to acknowledge that the complaint did not allege prior incidents of constitutional violations. Without such allegations, the County argues, the municipality cannot be said to have notice sufficient to attribute a custom or practice of municipal employees to the municipality itself.

Here, Limestone County appears to misunderstand the full thrust of Plaintiff's allegations against it. While the County is correct that where a plaintiff alleges a policy evinced by custom—"a

persistent widespread practice" of officials or employees—allegations of multiple incidents are

typically required. *Piotrowski v. City of Houston*, 237 F.3d 567, 581 (5th Cir. 2001). ("A *customary*

municipal policy cannot ordinarily be inferred from single constitutional violations." (emphasis

added)). But this is not required where a plaintiff's claim implicates "the jail's system of providing

medical care" itself. *Shepherd v. Dallas Cty.*, 591 F.3d 445, 453 (5th Cir. 2009) ("[Plaintiff's] claim . . .

does not implicate the acts or omissions of individuals but the jail's system of providing medical care

to inmates with chronic illness. . . . The jail's evaluation, monitoring, and treatment of inmates with

chronic illness was, at the time of [plaintiff's] stroke, grossly inadequate due to poor or non-existent

procedures and understaffing of guards and medical personnel, and these deficiencies caused his

injury."); *see also Estate of Henson v. Wichita Cty.*, 795 F.3d 456, 464 (5th Cir. 2015) (comparing cases

where a "detainee complains first of a particular act of, or omission by, the actor and then points

derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused

the act or omission" and those where the claims implicate the jail's system for providing medical

care). Here, many of Plaintiff's allegations indicate that it was Limestone County's system of

providing medical care that caused his injury. For example, Plaintiff alleges that Limestone County

failed to adequately staff the jail and failed to adequately fund medical care for prisoners. (Am.

Compl., Dkt. 9, ¶ 2). Other allegations in Plaintiff's complaint, including those about the jail's

staffing regarding how long it took for a physician to see Plaintiff and how Plaintiff was ultimately

released to seek and pay for medical treatment himself make these allegations plausible. (Am.

Compl. ¶¶ 36–44, 93, 97–101).

  Further, to the extent that Plaintiff alleges municipal liability based on the acts and omissions

of the officers the Court notes that a single incident exception has been recognized by the Fifth

Circuit. While that exception "appl[ies] only where the facts giving rise to the violation are such that

it should have been apparent to the policymaker that a constitutional violation was the highly

predictable consequence of a particular policy or failure to train," *Burge v. St. Tammany Par.*, 336 F.3d 363, 373 (5th Cir. 2003), here, Plaintiff alleges numerous repeated incidents involving eighteen different county employees who failed to provide him access to adequate medical care over the span of more than a week. These allegations may be enough, at this stage, to suggest that Plaintiff's constitutional injury was a "highly predictable" or "patently obvious" consequence of the county's failure to train its employees. *See Connick v. Thompson*, 563 U.S. 51, 64 (2011). The Court therefore rejects Limestone County's first argument that the Court's prior order contained a manifest error regarding whether Plaintiff had sufficiently alleged a municipal policy that led to Plaintiff's alleged injury.

Second, Limestone County argues that a non-employee, contract physician cannot be a policymaker for the county, as suggested in the Court's prior order denying Limestone County's motion to dismiss. Regardless of whether this is true, however, the Court's prior decision did not hinge on the allegation that Dr. Rettig alone was a policymaker for Limestone County. Instead, the Court noted that Plaintiff alleged other policymakers existed, including Sheriff Dennis Wilson. Further, at the motion to dismiss stage, Plaintiff need not identify the exact policymaker relevant to his claims. *See Groden v. City of Dallas*, 826 F.3d 280, 285 (5th Cir. 2016) ("[T]o survive a motion to dismiss, [plaintiff] needed only to plead facts—facts which establish that the challenged policy was promulgated or ratified by the city's policymaker. [Plaintiff's] complaint did not need to supply an answer to the legal question of the specific identity of the city's policymaker under the relevant statutory scheme."). Thus, the Court sees no reason to grant the extraordinary relief Defendant Limestone County requests on the basis that Dr. Rettig could not be a policymaker for the County where Plaintiff has adequately alleged other policymakers exist.

Because the Court finds no manifest error of fact or law in the Court's prior order denying Limestone County's motion to dismiss, the Court denies the motion for reconsideration.

34

## VI. Conclusion

The Individual Defendants' Motions to Dismiss (Dkts. 20, 22) are hereby **GRANTED** in part and **DENIED** in part.

The Individual Defendants' Motion to Dismiss with respect to Officer Allen is **GRANTED**.

The Individual Defendants' Motion to Dismiss with respect to Sergeant Jefferson and Sergeant Edwards is **DENIED**.

The Individual Defendants' Motions to Dismiss with respect to Officers Lockwood, Le, Vial, Cotton, Burleson, Willett, Nehring, Wiley, Winn, and Gude, Lieutenant Rhodes, Sargent Graves, and Nurse Nicki are **DENIED**. With respect to these Defendants, however, the issue of whether they are entitled to the protection of qualified immunity is not decided at this time. The Court therefore **ORDERS** limited discovery into the personal knowledge and personal conduct of each of these Defendants as it relates to the handling of Plaintiff Samuel Randle's medical needs from March 19, 2013 to March 26, 2013 while at the Limestone County Jail.

Further, Limestone County's Motion for Reconsideration (Dkt. 53) is hereby **DENIED**.

**SIGNED** on March 6, 2017.

_____

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

35